UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JSP SILVERDALE LAND LLC et al,

Plaintiffs/Petitioners,

v.

KITSAP COUNTY,

Defendant/Respondents.

CASE NO. 3:25-cv-05288-JNW

ORDER GRANTING
PETITIONER'S LUPA PETITION

## 1.  INTRODUCTION

This matter comes before the Court on Plaintiffs JSP Silverdale Land LLC, CG Silverdale Land LLC, and TC Silverdale Land LLC's (collectively, "Petitioners") claim under Washington's Land Use Petition Act ("LUPA"), RCW 36.70C., *et seq.*[1] Petitioners challenge the Kitsap County Board of County Commissioners' ("Board") decision upholding the Kitsap County Public Works Director's ("Director") method of calculating the newcomer's assessment for Petitioners' residential development in Silverdale, Washington.

---

[1] This case was consolidated with a second action, Case No. 3:25-cv-05558-GJL, which included the LUPA claim now before this Court. The Complaint reserves the federal claims to be decided outside the LUPA procedures.

ORDER GRANTING PETITIONER'S LUPA PETITION - 1

At its core, this case presents a question of statutory interpretation: whether the Kitsap County Code required the County to execute a newcomer's agreement that fixed the assessment rate for Petitioners' project, or whether the County could instead charge whatever rate happened to be in effect at the time of each sewer connection—a practice that nearly doubled the per-unit assessment over the life of the project.

The Court concludes that the Code unambiguously required the County to execute a newcomer's agreement establishing the assessment amount for the entire project. The Director's failure to do so, and the resulting practice of imposing mid-project rate increases—which the Board upheld on appeal—constitutes an erroneous interpretation of the law. The petition is GRANTED.

## 2.   BACKGROUND

Petitioners are property developers that sought to build a residential development, the "Highlands at Silverdale," in the unincorporated Silverdale area of Kitsap County, Washington. Dkt. No. 26-1 at 6. The Highlands at Silverdale contains 570 apartments in 18 buildings, in addition to community and commercial buildings and facilities. Kitsap County ("County") through the Public Works Sewer Utility ("Sewer Utility") provides sewer service to the area. *Id*.

The dispute in this matter arises from the "newcomer's assessment" that the County's Sewer Utility charged Petitioners. Under the Kitsap County Code, a newcomer's assessment "represents the newcomer's proportionate share for future expansion of the major components of the existing sewage system." KCC 13.14.060(b). The assessment is "held by the county in trust for future expansion of

ORDER GRANTING PETITIONER'S LUPA PETITION - 2

its sewage systems." KCC 13.14.060(c). The assessment amount is calculated based on "residential equivalent units" ("REUs"), and the per-REU rate is "established from time to time by the [Board of County Commissioners]." KCC 13.14.060(e). A "residential equivalent unit" is a standardized measure of anticipated sewage demand. Under the Code, each dwelling unit constitutes one REU. *See* KCC 13.14.140.

The Code provides that "whenever any [] entity desires to connect to an existing county sewage system" that entity "shall be required to subscribe a newcomer's agreement and pay a newcomer's assessment" and the "assessment shall be paid prior to any connection to the county's system." KCC 13.14.060(a). The newcomer's agreement "shall memorialize the number of [REUs] which a person or entity is entitled to connect to the county's sewage system and the amount paid therefor." KCC 13.14.060(f).

No newcomer's agreement was ever executed here. The newcomer's assessment rate changed three times during the project:

- Effective August 1, 2021: $6,481/REU (Board Resolution 124-2021, effective August 1, 2021). Dkt. No. 28-10 at 2.

- Effective August 1, 2022: $7,020/REU (Board Resolution 110-2022, effective August 1, 2022). Dkt. No. 28-11 at 2.

- Effective August 1, 2023: $9,939/REU (Board Resolution 131-2023, effective August 1, 2023). Dkt. No. 28-12 at 2.

Petitioners submitted their Administrative Conditional Use Permit ("ACUP") application in March 2021 and submitted building permit applications between

ORDER GRANTING PETITIONER'S LUPA PETITION - 3

April and July 2022. Dkt. No. 26-1 at 12. On August 8, 2022, the ACUP was approved. Dkt. No. 26-1 at 12; Dkt. No. 33-2. Two days later, on August 10, 2022, the County's Sewer Utility issued a fee letter identifying the REUs for the project at the $7,020/REU rate. Dkt. No. 31 at 6. The Site Development Activity Permit ("SDAP") was approved on August 9, 2022, and issued on August 25, 2022. Dkt. Nos. 33-3; 33-4.

On July 25, 2023, Petitioners paid the newcomer's assessment for Buildings 1 through 11, the clubhouse, and the community building—totaling 278 REUs—at the $7,020/REU rate then in effect. *See* Dkt. No. 26-1 at 22; *see also* Dkt. No. 28-1.

On February 24, 2024, the parties entered a "Phased Development Contract" under KCC 13.14.160 for the remaining 166 REUs (phases two and three). Dkt. No. 28-9. That contract stated that the "amount of newcomer's assessment attributable to each phase of development or discreet unit is pursuant to the Resolution in effect at the time of connection." Dkt. No. 28-9 at 3. The first physical sewer connections did not occur until early 2024. Dkt. No. 30 at 5; Dkt. No. 26-1 at 18.

Because the connections for the remaining units occurred after August 1, 2023, the Sewer Utility applied the $9,939/REU rate—the rate set by Resolution 131-2023—to those units. Dkt. No. 26-1 at 18, 23. As a result, Petitioners paid $7,020/REU for the first 278 REUs and were required to pay $9,939/REU for the balance. Dkt. No. 26-1 at 22–23.

On March 31, 2025, Petitioners objected to the mid-project rate increase through the dispute resolution process under KCC 13.14.180(c). Dkt. No. 28-4. On April 10, 2025, the Director rejected Petitioners' objections, maintaining that the

ORDER GRANTING PETITIONER'S LUPA PETITION - 4

newcomer's assessment are "ultimately valued and due at the time of connection—meaning when a sewer permit is issued allowing a project building to be connected to the utility system." Dkt. No. 26-1 at 18. Petitioners appealed the Director's decision to the Board, which held a public meeting on June 9, 2025, and denied the appeal. Dkt. No. 28-8.

Under RCW 36.70C.080(5), the parties waived the initial hearing and stipulated to a hearing on the merits, which the Court held on December 29, 2025. Dkt. No. 37. At the hearing, both parties confirmed that there are no factual disputes; this case turns entirely on the interpretation of Kitsap County Code Chapter 13.14.

The Court has reviewed the parties' briefing, the Administrative Record and its supplements, and the hearing transcript. Dkt. Nos. 25-1, 26-1, 27, 28, 30, 31, 32, 33, 34, 37. Because this was not a quasi-judicial proceeding, the record may be supplemented under RCW 36.70C.120(3), and the Court has considered the supplemental declarations and exhibits. Dkt. Nos. 28, 31, 33, 34.

### 3. LEGAL STANDARD

LUPA governs judicial review of land use decisions. *Durland v. San Juan County*, 340 P.3d 191, 196 (2014). When reviewing an administrative land use decision under LUPA, an appellate court stands in the shoes of the superior court and reviews the administrative record. RCW 36.70C.130; *King County Dep't of Dev. & Envtl. Servs. v. King County*, 305 P.3d 240, 243 (Wash. 2013). A party seeking reversal of a land use decision bears the burden of establishing one of six statutory

grounds. This case implicates subpart (1)(b): whether the land use decision reflects "an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise." RCW 36.70C.130(1)(b). Petitioners also contend that subpart (1)(d)—clearly erroneous application of the law to the facts—may apply. Dkt. No. 27 at 14.

Interpretation of county ordinances is a question of law reviewed de novo. *Ellensburg Cement Prods., Inc. v. Kittitas Cnty*, 317 P.3d 1037, 1041 (Wash. 2014). Where the plain language of a code provision is unambiguous, the Court applies it as written. *Id.* Plain meaning may be gleaned "from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." *Id.* (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 43 P.3d 4 (Wash. 2002)). The same principles apply to county ordinances. *Id.*

When a code provision is ambiguous, the Court affords "such deference as is due" to the local jurisdiction's interpretation. RCW 36.70C.130(1)(b). However, deference is not automatic. The local entity "bears the burden to show its interpretation was a matter of preexisting policy." *Ellensburg Cement*, 317 P.3d at 1046 (quoting *Sleasman v. City of Lacey*, 151 P.3d 990 (Wash. 2007)). "No deference is due a local entity's interpretation 'that was not part of a pattern of past enforcement, but a by-product of current litigation.'" *Id.* (quoting *Sleasman*, 151 P.3d at 990). An interpretation need not be memorialized as a formal rule, but the entity must "prove an established practice of enforcement." *Id.*

# 4. DISCUSSION

## 4.1 The County violated KCC 13.14.060 by failing to execute a newcomer's agreement and by imposing mid-project rate increases.

The threshold question is whether the Code unambiguously requires execution of a newcomer's agreement that establishes the assessment amount and thereby fixes the per-REU rate. The Court concludes that it does.

KCC 13.14.060(a) provides that "[w]henever any [] entity desires to connect to an existing county sewage system, such person or entity shall be required to subscribe a newcomer's agreement and pay a newcomer's assessment." The use of "shall be required" is mandatory. *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("It is undisputed that the word 'shall' imposes a mandatory command."); *Wash. v. Krall*, 881 P.2d 1040, 1041 (Wash. 1994) (stating, "the general rule that 'shall' is presumptively mandatory"). No newcomer's agreement was entered, and the Director's decision makes no mention of this critical failing. On this basis alone, the Director erred in interpreting the Code.

Subsection (f) reinforces this conclusion. It provides that the newcomer's agreement "shall memorialize the number of [REUs] which a person or entity is entitled to connect to the county's sewage system and the amount paid therefor." KCC 13.14.060(f). This language requires the agreement to state both the number of REUs and a specific dollar amount. To state "the amount paid," one must calculate that amount using the per-REU rate in effect at the time the agreement is executed. This necessarily fixes the rate at the point of agreement formation.

ORDER GRANTING PETITIONER'S LUPA PETITION - 7

Subsection (a) further provides that "the assessment shall be paid prior to any connection to the county's system," subject to two exceptions: installment plans under KCC 13.14.150 and phased development contracts under KCC 13.14.160. The default rule is that the full assessment is due in advance. This is inconsistent with the Sewer Utility's practice of charging whatever rate happens to be in effect at the moment of physical connection, which by definition cannot be known in advance.

The Court's reading is confirmed by the related provisions of KCC 13.14.160, governing phased development contracts. Section 13.14.160(b) requires such contracts to contain "[t]he amounts of the newcomer's assessment and/or latecomer's assessment for the entire development" and "[t]he amounts of the newcomer's assessment and/or latecomer's assessment attributable and chargeable to each phase or discrete unit of the development." KCC 13.14.160(b)(4), (5). These provisions require fixed, knowable dollar amounts at the time of contract formation. If the Code contemplated floating rates that change with each Board resolution, there would be no way to state the assessment "for the entire development" at the time the contract is executed.

Thus, reading KCC 13.14.060 and 13.14.160 together, the Code establishes a structure in which the newcomer's assessment is a fixed amount, determined at the point of agreement or contract formation, based on the per-REU rate then in effect. *See Ellensburg Cement*, 317 P.3d at 1041 (plain meaning may be gleaned from related code provisions).

The County argues that KCC 13.14.060(e) allows the Board to establish the per-REU rate "from time to time" authorizes mid-project rate changes. The Court

ORDER GRANTING PETITIONER'S LUPA PETITION - 8

disagrees. Subsection (e) authorizes the Board to adjust the assessment rate prospectively for future newcomer's agreements. It does not authorize the Sewer Utility to override the assessment amount already established in an executed newcomer's agreement. Reading subsections (a), (e), and (f) together, the Code's structure is coherent: the Board sets rates from time to time; when a developer enters a newcomer's agreement, the rate then in effect is used to calculate "the amount paid therefor"; and future rate adjustments apply to future agreements. This reading gives every provision independent work to do, consistent with the principle that code provisions must be harmonized so that none is rendered superfluous. *Whatcom Cnty. v. City of Bellingham*, 909 P.2d 1303, 1308 (Wash. 1996).

Accordingly, the Director's interpretation of KCC 13.14.060 was erroneous. Dkt. No. 26-1 at 18–19. The Code required the Sewer Utility to execute a newcomer's agreement establishing the number of REUs Petitioners were entitled to connect and the assessment amount for those REUs. KCC § 13.14.060(a), (f). The Sewer Utility never did so. By upholding the Director's interpretation, the Board committed the same error. It is the Board's decision—the final land use decision subject to LUPA review—that the Court reverses.

## 4.2    Even assuming ambiguity, neither the Director's interpretation nor the Board's affirmance are entitled to deference.

The Court finds the Code's requirement for a newcomer's agreement to be unambiguous. But even if the Code were ambiguous on the timing question, the County's position would not be entitled to deference.

Under *Ellensburg Cement*, a local entity bears the burden to show that its interpretation reflects "preexisting policy" rather than a position developed as "a by-product of current litigation." 317 P.3d at 1045–46. In *Ellensburg Cement*, the Supreme Court denied deference where the hearing board's deliberations reflected confusion and the absence of any settled interpretive practice. *Id*.

The record here presents an even more compelling basis for denying deference. At the Board's June 9, 2025, hearing, Sewer Utility staff acknowledged that "newcomer's agreements have not been used in recent or historical projects" and that "[s]tandard practice is not to have a newcomer agreement." Dkt. No. 25-1 at 7:4–5. A Commissioner recognized the problem, stating: "But it's something that's in our code, so is it something that we need to clean up?" Staff responded: "Absolutely." *Id*. at 10:11–13. This exchange shows that the County was aware the Code required newcomer's agreements and chose not to use them—this is an acknowledged departure from a mandatory code provision, not a preexisting interpretive policy of an ambiguous local law entitled to deference.

The County's reliance on the Declaration of Anthony Burgess, Dkt. No. 31, does not change this conclusion. Mr. Burgess held his position as Sewer Utility Project Manager for Kitsap County Sewer Utility from August 2023 until September 2025. Dkt. No. 31 ¶ 2. Although his declaration describes the Sewer Utility's practice of using fee letters and phased development contracts in lieu of newcomer's agreements, Dkt. No. 31 ¶¶ 3–5, this establishes at most that the Sewer Utility has substituted alternative instruments for the one the Code requires, but it

ORDER GRANTING PETITIONER'S LUPA PETITION - 10

does not demonstrate a preexisting interpretive policy regarding the Code's meaning.

Even so, the County urges that its interpretation is entitled to "great weight" under *Tahoma Audubon Soc'y v. Park Junction Partners*, 116 P.3d 1046, 1052 (Wash. Ct. App. 2005). But the *Tahoma Audubon* court never applied that standard; it found the code provisions at issue were unambiguous and concluded that *no deference* was owed. *Id.* at 1052 n.7. Even assuming the "great weight" standard applies here, the County must first demonstrate that its interpretation reflects preexisting policy. *Ellensburg Cement*, 317 P.3d at 1045–46. As discussed above, the County has not met that burden. Indeed, the standard under LUPA, as articulated by the Supreme Court in *Ellensburg Cement*, is "such deference as is due," which implicates a considered inquiry, not blanket deference. *Id.*

## 4.3    The Phased Development Contract does not validate the County's method of calculating the newcomer's assessment.

The County also relies on the Phased Development Contract signed February 24, 2024, which states that the assessment will be "pursuant to the Resolution in effect at the time of connection." Dkt. No. 28-9 at 3. This contract does not save the County's position for two reasons.

First, the contract does not comply with KCC 13.14.160(b)(4)'s requirement that phased development contracts state "[t]he amounts of the newcomer's assessment … for the entire development." KCC 13.14.160(b)(5) requires "[t]he amounts … attributable and chargeable to each phase or discrete unit of the development." The contract here does not state these amounts; it references a

ORDER GRANTING PETITIONER'S LUPA PETITION - 11

floating rate determined at the time of connection. The County does not address this deficiency. Because the contract's assessment provision conflicts with the Code's mandatory requirements, it cannot override the Code. *Cf. Evans v. Luster,* 928 P.2d 455, 457 (Wash. Ct. App. 1996) (contract made to violate municipal ordinance is void for illegality).

Second, the contract covered only phases two and three—the remaining 166 REUs—not the entire development. Dkt. No. 28-9. It does not govern the 278 REUs for which Petitioners had already paid. The Sewer Utility's decision to enter a non-compliant phased development contract for part of the project does not relieve it of its obligations under KCC 13.14.060.

Similarly, the County characterizes the $7,020/REU rate applied to Petitioners' July 2023 payment as a "courtesy" and "prepayment" that the Sewer Utility was not obligated to accept, arguing that Petitioners should have been charged the $9,939/REU rate in effect when the buildings physically connected in early 2024. Dkt. No. 30 at 2, 5. This argument underscores rather than undermines the Court's conclusion. Under the County's interpretation, a developer undertaking a multi-year project has no ability to know its total assessment obligation until each building physically connects—and the County retains unilateral discretion to increase that obligation at any time through a Board resolution. That result is difficult to reconcile with a Code that requires the newcomer's agreement to state "the amount paid therefor"—language that contemplates a fixed, knowable sum.

ORDER GRANTING PETITIONER'S LUPA PETITION - 12

**4.4    The Court does not rely on a theory of vesting to reach its decision.**

The County contends that Petitioners improperly argued that KCC 13.14.060 "silently creates a broad vesting mechanism" for utility fees, which Washington law generally rejects. Dkt. No. 30 at 10. The Court does not rely on a theory of vesting. The Court's decision rests on the plain text of the Kitsap County Code, which requires execution of a newcomer's agreement that establishes a specific assessment amount. The rate applied is the rate in effect at the time of agreement formation— not because the rate "vests," but because the Code requires the agreement to state "the amount paid therefor," KCC 13.14.060(f), which necessarily incorporates the then-current rate. This is a product of the Code's mandatory requirements, not a judicially imposed vesting doctrine.

**4.5    The applicable rate is $7,020/REU.**

Having concluded that the Director erred in interpreting the Code, and that the Board erred in affirming that interpretation, the Court must determine the appropriate rate for recalculation. Because the County never executed a newcomer agreement fixing the rate, the Court looks to the parties' concessions at oral argument and the record to determine when the agreement should have been executed and what rate would have applied.

At the hearing, Petitioners' counsel conceded that the $7,020/REU rate—the August 1, 2022, rate—has "a stronger basis" than the $6,481/REU rate they originally sought. Dkt. No. 37 at 17:8–12. The Court agrees. By August 2022, the conditions for a newcomer's agreement were present. The ACUP was approved on

ORDER GRANTING PETITIONER'S LUPA PETITION - 13

August 8, 2022. The Sewer Utility issued its first fee letter—identifying the project's REUs at the $7,020 rate—on August 10, 2022. The SDAP was approved August 9, 2022, and issued August 25, 2022. By that point, the Sewer Utility had sufficient information to execute a newcomer's agreement: it knew the number of REUs, the applicable rate, and the project scope. The County acknowledged at the hearing that August 2022 was the earliest point at which the Sewer Utility anticipated connections would be forthcoming. Dkt. No. 37 at 25:4–26:11. Had a newcomer's agreement been executed at that time, as the Code required, the rate incorporated into the agreement would have been $7,020/REU. The County also conceded at the hearing that "[o]nce the County accepts payments, they don't change the rate." Dkt. No. 37 at 26:1–2. This concession undermines the County's position that rates should float with each Board resolution.

Accordingly, the Court directs that Petitioners' newcomer's assessment for the entire Highlands at Silverdale development be recalculated at the rate of $7,020/REU.

## 5. CONCLUSION

Accordingly, the Court ORDERS as follows:

1. Petitioners' Land Use Petition Act petition, Dkt. No. 27, is GRANTED. The Board of County Commissioners' denial of Petitioners' appeal is REVERSED.

2. Kitsap County is DIRECTED to recalculate Petitioners' newcomer's assessment for the entire Highlands at Silverdale development at the rate

ORDER GRANTING PETITIONER'S LUPA PETITION - 14

of $7,020 per REU, consistent with the rate in effect when the newcomer's agreement should have been executed in August 2022.

3. Kitsap County is DIRECTED to refund to Petitioners any amounts paid in excess of the recalculated assessment, together with interest at the statutory rate from the date of each overpayment.

4. This matter is REMANDED to Kitsap County for proceedings consistent with this Order.

Dated this 6th day of May, 2026.

Jamal N. Whitehead
United States District Judge

ORDER GRANTING PETITIONER'S LUPA PETITION - 15